## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

ANGELA KLAUS,

      Plaintiff,

         vs.

KILB, ROGAL & HAMILTON CO.
    OF OHIO (a/k/a BERWANGER
    OVERMYER ASSOCIATES).

      Defendant.

Case No. C2-04-034
Judge Edmund A. Sargus, Jr.
Magistrate Judge Terence P. Kemp

## OPINION AND ORDER

Plaintiff, Angela Klaus (Klaus), brings this action against her former employer, Defendant Kilb, Rogal & Hamilton Co. of Ohio, a/k/a Berwanger Overmyer Associates, claiming gender discrimination in violation of Title VII, 42 U.S.C. § 2000 *et seq*., and Ohio Revised Code § 4112.02, as well as a violation of the Equal Pay Act, 29 U.S.C. § 201 *et seq*. Klaus also alleges retaliatory discharge, breach of contract and promissory estoppel. BOA asserts a Counter-Claim for breach of the covenant not to compete contained in her Employment Agreement. This matter is before the Court for consideration of the parties' Cross-Motions for Summary Judgment and BOA's Motions to strike supporting affidavits. For the reasons that follow, BOA's Motion for Summary Judgment on Plaintiff's claims is granted in part and denied in part; Klaus's Motion for Summary Judgment on the Counter-Claims is denied; and BOA's Cross-Motion for Summary Judgment on the Counter-Claims is denied.

## I.

Defendant, Hilb Rogal & Hobbs of Ohio (a/k/a Berwanger Overmyer Associates)("BOA"),[1] provides financial and insurance products, planning and services to businesses and individuals in the Central Ohio area. BOA specializes in various types of commercial property and casualty insurance, together with professional liability, homeowner and automobile insurance. BOA is also involved in employee benefits and corporate retirement planning.

During the time Angela Klaus worked at BOA., the company sold financial planning services, mutual funds, and retirement plans to individual investors through BOA's Financial Services Division. On April 16, 2001, BOA hired Klaus as a producer in its Financial Services Division to sell insurance and financial products to individuals and businesses.

Klaus executed a written contract of employment with BOA, which the company drafted. The employment agreement requires 30 days written notice as a condition precedent to termination, absent termination for fraud or misconduct: "The Producer's employment hereunder may be terminated, at any time, by either party, with or without cause, upon thirty (30) days written notice." (Empl. Agmt., p. 5, ¶11.)

The employment agreement further prohibited Klaus from disclosing "confidential information," which is defined as information (a) acquired by during the course of employment and (b) not generally known in the insurance business or relevant trade or industry. In particular, the agreement defines confidential information:

---

[1]	In 2001, Hilb Rogal & Hobbs purchased BOA. BOA officially changes its name to Hilb Rogal & Hobbs in 2005. Because the parties commonly referred to the company as BOA during the time of Plaintiff's employment there, the Court will refer to Defendant as BOA.

...information and know-how acquired by Producer during or as a result of past, present or future employment by BOA, which is not readily available to the general public, and which relates to the existing, proposed or anticipated business, services, or commercial activities of BOA or its customers, clients, policyholders, or referral sources, including but not limited to BOA's methods of operation and training, business plans, financial information, personnel information, customer or prospective customer lists, and expiration lists, obtained by Producer in the course of his/her employment under this Agreement which are not generally known in the insurance business or relevant trade or industry.

(Empl. Agmt., ¶ 12(a).) The agreement provided that Klaus ". . . shall not at any time, either during or after employment, directly or indirectly, disclose or disseminate to any third party or use any Confidential Information . . ." (Empl. Agmt., ¶ 12(b).)

The employment agreement also contained a covenant not to compete, which stated in relevant part:

    b.    For a period of twenty-four (24) months following termination of employment, Producer shall not, directly or indirectly, for the benefit of Producer or others, either as principal, agent, manager, consultant, owner, employee, or otherwise, engage in any of the following:

        I)    solicit or attempt to solicit any person or entity who was a customer, client, or policyholder of BOA at any time during the one year period immediately preceding the termination of Producer's employment, for the purpose of providing or selling products or services provided by BOA at the time of Producer's termination.

        ii)    Provide or sell products or services provided by BOA at the time of Producer's termination, to any person or entity who was a customer, client, or policyholder of BOA at any time during the one (1) year period immediately preceding the termination of Producer's employment.

        iii)    Solicit, attempt to solicit, or hire any employee of BOA, or provide any information regarding individual employees of BOA to any individual, agency or company for the purpose of facilitating the recruitment of said employees.

(Empl. Agmt., ¶ 13.)  BOA and Klaus further agreed that after she left BOA's employment, she could represent BOA clients who actively sought out her services without her interference or solicitation. (Empl. Agmt., § 13c.)  If this situation occurred, Klaus agreed that she would "compensate BOA by paying to BOA two (2) times the first year's gross commissions and/or fees received by [her] after the termination of this Agreement from such business, or two (2) times the annual gross commissions and/or fees which has been received by BOA as an agency from such business, whichever is greater." (*Id.*) The covenants and agreements relating to Section 12, regarding confidential information, and Section 13, regarding non-competition, "survive the termination of employment of the Producer."  (*Id.*, at § 11.)

Under the terms of the Employment Agreement, BOA agreed to pay Klaus an initial "salaried" period, followed by 100% commission-based payments. For the first twelve months of her employment, Klaus was paid a salary of $4,000/month, or $48,000 annually, and a car allowance of $250/month.[2]

After graduating from college in 1998, Klaus gained experience in the financial services field by working as a financial analyst and financial planner.  She had experience in servicing, promoting and marketing financial services and products.  Klaus, however, had never worked on a commission basis and never sold financial services products such as mutual funds, securities, or qualified retirement plans before working at BOA in 2001.  Prior to her employment at BOA, Klaus obtained her NASD Series 6 and NASD Series 63 licenses, which enabled her to sell securities.

---

[2]     Klaus negotiated this base salary and car allowance with Mr. Ferris, her initial supervisor, who subsequently passed away during Klaus' tenure at BOA.

BOA paid for Klaus to take the final examination necessary to obtain her Certified Financial Planner (CFP) designation, which relates to the sale of investments, and for her Chartered Life Underwriter (CLU) designation, which relates insurance and advanced insurance strategies. Klaus also held a license as an Investment-Advisor Representative (IAE). BOA paid for Klaus's mandatory continuing education to maintain her CFP and CLU designations, attendance at professional conferences, and her dues for membership in trade associations.

When she began her employment, Klaus's initial supervisor, Bob Ferris, met with her weekly in an effort to develop her career and train her as a producer. Ferris and her coworkers supported Klaus in business and career development as a producer by giving her referrals, leads and additional training. When Ferris passed away, BOA gave Klaus many of his clients. Approximately 80% of Klaus's business resulted from internal BOA referrals from other BOA producers. (Klaus Dep., 231-233.) The remaining 20% of Klaus's business came from clients she had obtained through her own efforts while at BOA. (*Id.*)

After the first twelve months of her employment, Klaus no longer received a base salary and instead was paid on a completely 100%-commission basis. Klaus was allowed to take $4,000/month as a draw against her potential commissions.[3] Generally, a producer at BOA was required to

---

[3]     Schedule A of the Employment Agreement described how commissions were calculated:

The Producer shall be paid the following percentages of gross commissions generated by him/her and received by BOA:

> Life commissions* 45% of new and renewal business
> Individual disability income 45% of new and renewal business
> commission and fees*
> Financial planning service fees 50%
> *Producer shall share in joint cases 22.5% where BOA's revenue is
> product commission only.

generate enough business each month so that his or her commission is equal to or greater than the producer's monthly draw.  If the producer failed to do so, the producer had a negative balance, and, in essence, would have taken more money from BOA than he or she was entitled, and would be "overdrawn" on commission ("overdrawn commission").

According to BOA, under a producer's employment agreement, overdrawn commissions are considered loans. (Overmyer Dec. ¶7, Employment Agmt., Section 3.b ("All draws paid to the Producer in excess of commissions actually earned shall constitute a loan from BOA to the Producer...").  Klaus understood that she could renegotiate the amount of her monthly draw for a higher or lower amount and, in fact, once considered decreasing it because her production was not covering her draw.

During her employment, Klaus received various performance awards, including membership in BOA's "Master's Club," and "Top 100 List."  Admission to the Master's Club was highly desirable, as it entailed various benefits and rewards for top producers.  Similarly, the Top 100 list recognized the top 100 out of the approximately 400 producers throughout the country.  Membership in the Master's Club was awarded on an annual basis. Different divisions within BOA had different sales goals to qualify for membership. In 2002-2003, for example, financial services producers such as Klaus needed $95,000 to qualify. (Overmyer Dep. 129-131.)  Producers in other divisions needed $55,000 to qualify.

In December, 2002, Klaus complained to her then supervisor, Ron Overmyer, that she had not been admitted to the Master's Club, despite her belief that she had generated sufficient sales to

_____

(Employment Agmt., Schedule A.)

qualify. According to Klaus, her deceased supervisor (Mr. Ferris) told her that she needed $75,000 in sales to qualify for membership. Overmyer researched the issue, could not confirm or deny what Ferris told Klaus, and decided to admit Klaus to the Master's Club. On or about January 6, 2003, after an initial announcement in which Klaus's name was not included, BOA announced that Klaus had been admitted to the Master's Club.

Klaus often complained to BOA's Accounting Department that her commissions had been miscalculated. Each time Klaus raised such an issue, the Accounting Department reviewed the commission in question and, if necessary, corrected the error. Klaus acknowledged that the errors sometimes were inadvertent because the accounting was difficult. She maintained, however, that many of BOA's accounting practices were inaccurate and sometimes outright false. She complained that BOA failed to pay commissions owed to producers or misled them about their pay.

On May 1, 2003, BOA hired Dax Welsheimer as a producer in its Financial Services Department. Klaus and Welsheimer had the same title. As producers in the Financial Services Department, Klaus and Welsheimer's job carried the same skill, effort, responsibility and working conditions.

Welsheimer had experience selling corporate retirement plans and corporate nonqualified deferred compensation plans. He was hired to focus primarily on corporate retirement accounts.[4] Although Welsheimer had not obtained a CLU or CFP professional designation, he held a Chartered Retirement Plan Specialist (CRPS) designation, had nine years relevant work experience, had sold

---

[4] Shawn Sentz averred in his Declaration that, prior to this lawsuit, BOA never distinguished accounts as corporate or non-corporate and never suggested that Klaus' or Welsheimer's authority, activity or scope of work was limited to either corporate or individual accounts. (Sentz Decl.,¶ 22.) BOA has moved to strike Sentz's Declaration, which the Court addresses *infra*.

products and services on a commissioned basis, and had an existing client base he intended to bring with him to BOA.

Welsheimer's initial twelve-month salary was $84,000 with a $400/month car allowance. After the first twelve months, Welsheimer was paid solely on commission with an initial draw of $7,000 per month.[5]

Because they focused on different products and services, Welsheimer and Klaus had different producer employment agreements. Welsheimer sold more pension plan business while Klaus' business was made up mostly of individual mutual funds. Thus, their commission structures were different. For example, Welsheimer received 60% commission on sales of personal lines; Klaus did not sell personal lines. Klaus received 45% of new and renewal business for life commissions; Welsheimer did not sell life commissions. Both Welsheimer and Klaus received 45% of new and renewal business on the sale of disability insurance policies.

Welsheimer, as a new producer at BOA, lacked the co-worker and vendor infrastructure for client referrals and business development. Ron Ohsner, the Financial Services Division supervisor, met with Welsheimer on a weekly basis and monitored his progression. Ohsner provided Welsheimer with referrals and leads to assist him in generating business. Klaus maintains, however, that immediately after hiring Welsheimer, BOA began transferring accounts, referrals and responsibilities to him that were supposed to have gone to her. Klaus contends that she was treated less favorably than Welsheimer, a comparable male producer, with respect to the transfer of business

---

[5] Plaintiff maintains that BOA did not require males to repay overdrawn commissions and, in fact, Welsheimer retained draws in excess of commissions in the amount of $40,000 to $60,000. This assertion, however, is not supported by competent evidence. *See* analysis *infra* with respect to Sentz Declaration.

and credit for business relationships. Klaus indicates that BOA transferred accounts of Brian Foy and Jeffrey Smith to Welsheimer instead of her, notwithstanding that she had a closer business relationship with the clients and that both Foy and Smith expressed a preference to work with her. Ohsner told other producers not to refer work to Klaus, and instead to give all referrals to him.

In December, 2002, Klaus expressed complaints regarding her belief that BOA was not complying with securities laws. She contended the NASD required that commissions on the sale of securities be received directly by the registered representative who had earned the commission. Instead, BOA required Klaus and other producers who sold securities to assign their commissions to Joseph Berwanger (a BOA employee and registered representative), who would provide the money to BOA, which in turn would distribute the commissions to the producer who had earned it. Klaus also believed that her supervisor, Ohsner, lacked the proper NASD license to oversee a registered representative like herself. Klaus, however, has no legal training and no expertise in SEC compliance issues. BOA hired an auditor to review its practices in 2003. The audit found no impropriety in any of BOA's practices, including the practices of which Klaus had complained. (Overmyer Dec. ¶12.)

Klaus maintains that during her employment, BOA permitted degrading and discriminatory actions and remarks directed at her and other women. Klaus indicates that BOA encouraged and permitted sexual and lewd communications in the workplace. Ohsner openly presented Viagra pills to males in the office. E-mails denigrating women and photographs depicting female nudity were exchanged within BOA. Klaus also asserts that no women held positions in upper management, and, in particular, on BOA's Advisory Committee, during the time she was employed there. Klaus asserts that she complained of this gender discrimination at BOA to Ohsner and Director of Human

-9-

Relations, Nancy Price.

BOA contends that it had debated closing its Financial Services Division for several years. BOA asserts that the Financial Services Division had remained relatively unprofitable and had greater potential risks than the company's other traditional insurance divisions. According to BOA, by mid-2003, it had decided to phase out its Financial Services Division completely. BOA determined its greatest immediate area of exposure was the sale of mutual funds to individual investors. BOA reviewed the business of its financial services producers (including Klaus), and found that the sale of individual securities accounted for nearly 93% of Klaus's book of business. Overmyer Dec. ¶19. BOA indicates that it decided to terminate Klaus to reduce its immediate risk as the initial step in winding down the Financial Services Division. (*Id.*)[6]

On September 29, 2003, five months after it hired Welsheimer, BOA gave Klaus written notice that her employment was terminated, effective that day. Klaus was then physically escorted from the building and has not worked for BOA since that date of September 29, 2003. Although her Employment Agreement required a 30-day pre-termination notice, BOA opted to pay Klaus her monthly draw through October 30, 2003 in lieu of notice.

When she was terminated, BOA contends that Klaus had not earned enough commissions to cover her monthly $4,000 draws and had a negative account balance of $9,683.34. (Overmyer Dec. ¶9, 21.) Klaus has not repaid this amount, and BOA has sued Klaus to collect it. Klaus contends that she is not in arrears and that, instead, BOA owes her in excess of $14,000 for past

---

[6]     Plaintiff asserts that BOA did not announce this plan until well after she was terminated. The record contains several pieces of correspondence Ron Ohsner dated November 19-23, 2003 indicating to vendors and internal employees the BOA plan to divest itself from the sale of individual securities. (Doc. #02337-02338, 00020, 00018 & 02344.)

compensation.

At the time of her termination, Klaus was the sole female producer in the Financial Services Department. When she demanded to know the basis for her termination, the BOA Human Resources Director, Nancy Price, told Klaus that she was being terminated due to a negative account balance. Klaus asserts that no one at BOA told her at any time that the company was withdrawing from the individual securities market or winding up the Financial Services Division.

BOA asserts that it issued an amended memorandum regarding Klaus' termination, dated October 2, 2003. The amended memorandum stated as follows:

> Angie, as of Monday, September 29, 2003, your employment with Berwanger, Overmyer Associates and Hilb, Rogal and Hobbs was terminated. This memo has been revised to agree with our further conversation on Tuesday afternoon, September 30, and outlines what will happen to payroll and benefits.
>
> 1.  Your full September 30 paycheck was direct deposited as usual. I gave you your payroll advice for that period with the initial paperwork. In addition, you will receive two more paychecks from which your usual deductions will be taken, including all benefits & 401(k). For our records/database, your termination will be October 30, 2003.

(Memorandum from Nancy Price to Angela Klaus dated 10/2/03, Klaus Affidavit, Exhibit 3.)[7]

At the same time, BOA retained Welsheimer, although it allegedly intended to close the Financial Services Division, because BOA had already made the business decision to continue to pursue the corporate retirement account market. (Overmyer Dec. ¶19.) BOA divested itself of all individual securities accounts by July, 2004. It ultimately closed its Financial Services Division, and Welsheimer resigned approximately two years after BOA fired Klaus. At the time Welsheimer left

---

[7]     Klaus denies that BOA ever provided the amended notice to her. She contends that she was not in Columbus on the date BOA claims to have given her the amended notice of termination.

BOA, his draws exceeded his commissions by $40,000 to $60,000. BOA is presently in negotiations with Welsheimer for collecting that amount.

Klaus filed a Complaint against BOA on January 16, 2004 asserting claims for gender discrimination in violation of Title VII, 42 U.S.C. § 2000 *et seq.* and the Ohio Revised Code § 4112.02 and a claim under the Equal Pay Act, 29 U.S.C. § 201 *et seq.* Klaus also alleges retaliatory discharge, breach of contract and promissory estoppel. BOA filed it Answer generally denying liability, and asserted a Counter-Claim for breach of the covenant not to compete contained in her producer Employment Agreement.

## II.

Defendant BOA moves to strike portions of the Shawn Sentz Affidavit and the Supplemental Affidavit of Angela Klaus.[8] Rule 56(e) of the Federal Rules of Civil Procedure sets forth three requirements for affidavits used in support of or in opposition to a motion for summary judgment, in that affidavits "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e). "These requirements are mandatory." *Reddy v. Good Samaritan Hosp. & Health Ctr.*, 137 F. Supp.2d 948, 954 (S.D. Ohio 2000) (citing Charles A. Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE § 2738 (2d ed. 1983). "An affidavit that does not satisfy the requirements of Rule 56(e) is subject to a motion to strike." *Reddy*, 137 F. Supp.2d at 954 (citation omitted). Further, an affiant "may not

---

[8] Plaintiff occasionally inserts a request in her Memoranda that the Court strike various statements in Defendant's supporting declarations. The Court does not construe these statements as formal Motions to Strike because S.D. Ohio Civ. R. 7.2(a) requires that "[a]ll Motions . . . shall be accompanied by a memorandum in support thereof which shall be a brief statement of the grounds, with citation of authorities relied upon."

create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986).

## A.    Motion to Strike Sentz Declaration

Defendant contends that Shawn Sentz had no management responsibilities at BOA. Because Sentz was neither a decision maker nor manager, BOA argues that he does not have "personal knowledge" of the management decisions he attributes to BOA in his declaration. Moreover, BOA asserts that certain of Sentz's declaration statements are inconsistent with his prior deposition testimony, or otherwise are vague and conclusory. BOA therefore seeks to strike paragraphs 3, 4, 7-14, 16, 18-31, 33, 35, 36 and 38-40 of Sentz's declaration.

Stated broadly, BOA contends that Sentz is incompetent to testify regarding management-level issues at BOA and that several of his declaration statements are inconsistent with this general proposition. BOA asserts that Sentz's title of Vice President was nothing more than "honorific," that he had no supervisory role at BOA, and was merely a co-worker. Therefore, BOA contends, Sentz could have no first-hand knowledge on which to base several of his statements regarding BOA's strategic decisions, and, even if he did, his opinions are irrelevant because he was not directly involved in the decision-making process.

The question of Sentz's actual or apparent authority, however, need not be resolved for purposes of this Motion. Sentz may, and in fact has, testified from personal knowledge as a lay witness to the events that transpired with respect to the hiring, comparative qualifications and unequal compensation between Klaus and Welsheimer. Moreover, the Court finds nothing inconsistent in Sentz's declaration testimony regarding the decision to hire Welsheimer and his

deposition testimony. BOA involved Sentz in the decision to hire Welsheimer, and Sentz may testify about these consultations. These topics, and those regarding Sentz's involvement or knowledge of matters concerning the strategic planning for the Financial Services Department, are subject to cross-examination. So, too, are the statements that BOA maintains are vague and conclusory. BOA's Motion for Summary Judgment is not a substitute for trial on the merits, and this Court is prohibited from encroaching upon the role of the trier of fact by making credibility determinations or weighing the evidence. Sentz's declaration touching on these matters, accordingly, will not be stricken. Defendant's Motion to Strike the Sentz Declaration is therefore **DENIED**.

**B.     Motion to Strike Klaus Supplemental Affidavit**

BOA contends that much of Klaus's Supplemental Affidavit should be stricken because it is not based on personal knowledge, does not contain facts that would be admissible in evidence, directly contradicts her prior deposition testimony and contains improper opinion testimony.

BOA moves sentence by sentence through Klaus's Supplemental Affidavit, attacking her ability to testify from personal knowledge, or asserting that the statement is irrelevant, conclusory or argumentative. While the Court agrees that much of Klaus's Supplemental Affidavit is argumentative in tone, there is no basis to strike most of the testimony because the Supplemental Affidavit is based on what Klaus personally saw, heard or did during her employment with BOA. Klaus generally testifies about what she perceived in the business operations and her participation in the day-to-day business affairs of BOA. Moreover, the Court detects no material deviation between Klaus's statements in her Supplemental Affidavit and her previous deposition testimony, at least none that the Court cannot decipher on its own as proper Rule 56 evidence. BOA's Motion to Strike is therefore denied to this extent.

-14-

BOA also seeks to exclude various unemployment forms that BOA provided to the Ohio Department of Jobs and Family Services (ODJFS) in connection with Klaus's termination (Klaus Supp. Aff., ¶ 39-42.) BOA asserts that these forms are absolutely privileged and may not be used in any other legal proceeding for any purpose whatsoever. Klaus claims that BOA admitted to the ODJFS that she was fired for lack of production, and uses these forms in an effort to cast doubt on BOA's stated rationale for her termination of employment– closing its line of business in which Klaus was employed.

Ohio Revised Code § 4141.21 provides as follows:

> . . . "[T]he information maintained by the director of job and family services or furnished to the director by employers or employees pursuant to this chapter is for the exclusive use and information of the department of job and family services in the discharge of its duties and shall not be open to the public or be used in any court in any action or proceeding pending therein, or be admissible in evidence in any action. . . . All of the information and records necessary or useful in the determination of any particular claim for benefits or necessary in verifying any charge to an employer's account under sections 4141.23 to 4141.26 of the Revised Code shall be available for examination and use by the employer and the employee involved or their authorized representatives in the hearing of such cases, and that information may be tabulated and published in statistical form for the use and information of the state departments and the public.

BOA contends Ohio Revised Code § 4141.21 prohibits the introduction of the ODJFS forms she seeks to admit. BOA's Motion to Strike in this regard is likewise denied.

The Court concludes that the ODJFS records Klaus seeks to introduce are not absolutely privileged and should not be stricken. *See Freed v. Grand Court Lifestyles, Inc.*, 100 F. Supp. 2d 610 (S.D. Ohio 1998)(Rice, J.)(finding state agency records relating to employee's claim of disability were not privileged in employee's federal ADA action, despite Ohio Rev. Code § 4112.21 prohibition on disclosure of records). BOA's statements in response to Klaus's unemployment

compensation are relevant to her claims, in particular, as set forth *infra*, her assertion that BOA's

offered rationale for her termination (closure of the individual securities business) is a pretext for

gender-based discrimination. A claim by BOA on the ODJFS form that Klaus was terminated due

to "lack of production" is arguably at odds with its assertion that she was terminated because the

company was winding up a line of business. As stated in *Freed*:

> [T]he Court does not dispute that OBES would have trouble operating its
> unemployment compensation system without the voluntary cooperation of employers,
> who provide the agency with records and files. The Court is less persuaded, however,
> by Ohio's interest in protecting the confidentiality of information provided by a
> claimant like Freed, who subsequently initiates a discrimination lawsuit against her
> former employer. As the Seventh Circuit recognized in *E.E.O.C. v. Illinois Dept. of
> Employment Security*, 995 F.2d at 108, "an employee with less to fear from calumny
> is more likely to claim benefits to which he is entitled, but secrecy also enables
> employees to bamboozle other employers by hiding the true reasons for their
> separations."

*Freed*, 100 F. Supp. 2d at 618. For these reasons, BOA's Motion to Strike Klaus's Supplemental

Affidavit is **DENIED**.

### III.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories

and admissions on file, together with affidavits, if any, show there is no genuine issue of material

fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The

movant has the burden of establishing that there are no genuine issues of material fact, which may

be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential

element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). To avoid summary

judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt

as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986); *Moore v. Philip Morris Cos.*, 8F3d 335, 340 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be presented in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence). In responding to a motion for summary judgment, however, the nonmoving party "may not rest on mere allegations... but ... must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P.56(e); *Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita*, 475 U.S. at 587-88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

## IV.

### A.  BOA's Motion for Summary Judgment as to Klaus's Claims

#### 1.  Equal Pay Act

The Equal Pay Act prohibits sex discrimination and provides as follows:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (I) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: Provided, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C. § 206(d)(1). Through the Equal Pay Act, Congress intended "to remedy what was perceived to be a serious and endemic problem of employment discrimination in private industry–the fact that the wage structure of 'many segments of American industry has been based on an ancient but outmoded belief that a man, because of his role in society, should be paid more than a woman even though his duties are the same.'" *Corning Glass Works, v. Brennan*, 417 U.S. 188, 195 (1974)(quoting S. Rep. No. 176, 88th Cong., 1st Sess., 1 (1963)).

In order to establish a *prima facie* case under the Equal Pay Act, 29 U.S.C. § 206 *et seq.*, Plaintiff must show that BOA paid different wages to male employees "for equal work on jobs the performance of which require[d] equal skill, effort, and responsibility, and which [were] performed under similar working conditions." *EEOC v. Romeo Community Schools*, 976 F.2d 985, 987 (6th Cir.1992)(quoting *Corning Glass Works*, 417 U.S. at 195). "However, not all differences in pay for equal work constitute violations"of the Equal Pay Act. *Timmer v. Mich. Dep't of Commerce*, 104 F.3d 833, 843 (6th Cir.1997) (citing *Corning Glass Works*, 417 U.S. at 195).

-18-

BOA maintains that Klaus cannot prove her Equal Pay Act claims because she and Welsheimer were not paid "wages." BOA further contends that any difference in compensation was justified by Welsheimer's prior relevant work experience and his negotiated demands.

### (a.) *Wages / Commissions*

As an initial matter, BOA maintains that Klaus and Welsheimer were not paid different "wages." BOA contends that Welsheimer's and Klaus's time at BOA coincided for only five months, from May 1, 2003 through September 29, 2003. During those five months, Welsheimer received his $7,000 per month salary, while Klaus was paid on a commission basis because she was beyond her twelve-month initial salary period. Therefore, according to BOA, Welsheimer and Klaus did were not paid different "wages" under the Equal Pay Act.

Klaus counters that the Equal Pay Act applies when a defendant's compensation system is determined on the basis of commissions. Indeed, an employer may not pay a female employee at a lower rate of commission for selling the same product when the differential is not justified by any difference in economic benefit to the employer. *Bence v. Detroit Health Corp.*, 712 F.2d 1024, 1031 (6th Cir. 1983); *see also Keziah v. W.M. Brown & Son, Inc.*, 888 F.2d 322, 325 (4th Cir. 1989) (plaintiff established *prima facie* violation of Equal Pay Act despite contention that no salary differential existed because male and female sales representatives worked for commissions where evidence revealed that draws were in fact "base salaries" which were not reduced even if earned commissions did not equal draw).

BOA essentially argues that no salary differential between Klaus and Welsheimer existed because the Welsheimer was within his initial salaried period of $7,000 per month and Klaus was into her exclusively commissioned period, albeit she was taking a $4,000 per month draw. BOA

-19-

insists that the two employees did not sell the same products, and, had they sold the same product lines, they would have been paid the exact same commission rate.[9]  Welsheimer's initial salary and was higher, BOA contends, because of his alleged experience in the field, he was expected to sell more than Klaus, and thus earned more.[10]

The parties do not dispute that Welsheimer was given a starting salary of $84,000, significantly larger than that of Klaus, at $48,000.  The total remuneration received by Welsheimer and Klaus was unequal, and Welsheimer, at bottom, made more money than Klaus.  With the exception of the products they sold, BOA insists that the work performed by both Welsheimer and Klaus was the same.  Given the broadly remedial nature of the statute, *Corning Glass Works*, 417 U.S. at 208, the Court attaches no significance under the Equal Pay Act to the fact that Klaus was terminated when she was earning commissions, while at the same time Welsheimer was enjoying his initial salaried period.  The point is that a jury could find that the methods of compensation were vastly different.  The Court therefore denies Defendant's Motion for Summary Judgment in this regard.

### (b.)  *Factor Other Than Gender*

BOA relies on the fourth affirmative defense, namely that a factor other than sex accounts

---

[9]     The parties actually dispute whether Klaus and Welsheimer were paid the same commission rate for the sale of the same products.  Klaus contends, for instance, that Welsheimer received a commission of 60% for sales of personal line products while she received only a 20% referral fee; Welsheimer received a commission on a case-by-case basis for pension services, while Klaus received nothing for such work. (Klaus Supp. Aff., ¶ 54.)  The record, however, is unclear as to whether Klaus actually sold these products.

[10]     BOA also places no meaning to the fact that Klaus was entitled to a $4,000 monthly draw and Welsheimer was entitled to a $7,000 draw under his employment contract.  BOA instead argues that, his draw was higher because they expected him to sell more.  BOA also contends that, had Klaus stayed at the company after Welsheimer completed his initial year, there would not have been any differential between their pay as both would have been paid solely on commissions.

for any wage differential between Klaus and Welsheimer. To be entitled to summary judgment, BOA must therefore prove that there is no genuine issue as to whether the difference in pay is due to a factor other than sex. *Romeo Community Schools*, 976 F.2d at 989. "[T]he employer must prove that 'sex provides no part of the basis for the wage differential'" in order to prevail on summary judgment. *Timmer*, 104 F.3d at 844 (quoting *Brennan v. Owensboro-Daviess County Hosp.*, 523 F.2d 1013, 1031 (6th Cir.1975)).

Defendant relies on this Court's previous decision in *Bahner v. Aelita Software Corp.*, 2005 WL 2416549 (S.D. Ohio 2005) (Sargus, J.). There, this Court determined that the plaintiff had established a *prima facie* case under the Equal Pay Act. The Court granted summary judgment to the defendant because the plaintiff had offered no evidence raising a genuine issue of material fact in response to the employer's proof that at the time it had created the pay differential (1) the male employee had an Master of Business education degree (the female plaintiff did not), (2) the female plaintiff did not have substantially comparable work experience, and (3) the female employee had not undertaken to bargain for higher pay.

The Court concludes that genuine issues of fact remain for disposition by a jury regarding whether gender played any part of the basis for the wage differential between Klaus and Welsheimer. BOA contends that Welsheimer had eight years of experience in the industry and in selling financial services and products on commission. Klaus counters that she had six years of service in the industry and possessed advanced professional licenses that Welsheimer did not hold. The parties dispute the extent of Klaus' prior work history in the industry, and whether Klaus had prior experience selling financial services products, although she concedes that she never sold anything on commission. Further, the parties dispute the existence and extent of any value that Welsheimer's

book of business brought to BOA versus the value of Klaus' extensive list of potential referrals for business.

BOA cites to *Bahner* for the proposition that a male employee's higher compensation may be justified by the fact that he requested a higher salary at the outset of his employment. BOA points out that Welsheimer was hired two years after Klaus and negotiated a higher initial salary and car allowance. The fact that Welsheimer negotiated a better employment package standing alone, however, is not dispositive. Certainly, a wage differential based on education or experience is a factor other than sex for purposes of the Equal Pay Act. *Balmer v. HCA, Inc.*, 423 F.3d 606 (6th Cir. 2005). Indeed, consideration of a new employee's prior salary is permissible so long as the employer does not rely solely on prior salary to justify a pay disparity. *Id.*, at 612 (citing *Irby v. Bittick*, 44 F.3d 949, 955 (11 [th] Cir. 1995)("If prior salary alone were a justification, the exception would swallow up the rule and inequality in pay among genders would be perpetuated.")). The catch-all provision of the Equal Pay Act, however, "does not include literally *any* other factor, but a factor that, at a minimum, was adopted for a legitimate business reason." *EEOC v. J.C. Penney Co., Inc.*, 843 F.2d 249, 253 (6th Cir.1988) (citation omitted). Here, the fact Welsheimer's apparently successful negotiated an initial salary $36,000 more than Klaus, does not entitle BOA to summary judgment.

In contrast to *Bahner*, where there was a complete failure of proof, here, Klaus has adduced evidence, in the form of her own and Sentz's testimony, that Klaus's education, licensing and experience were all superior to those of Welsheimer, raising a question as to whether the wage differences were based on gender. Although BOA protests that Sentz was nothing more than Klaus's co-worker and that his testimony is irrelevant, the record demonstrates that Sentz had years of

-22-

experience in the industry and was employed at BOA for 18 years. He worked directly with Klaus and Welsheimer there. Sentz observed that Klaus's work was excellent, and that Welsheimer's work was inadequate. Overmyer consulted with Sentz before he hired Welsheimer, and Sentz told Overmyer that he was extremely concerned about Welsheimer's licensing, skills, abilities and job experience. Although Sentz introduced Welsheimer to BOA and was familiar with him, ultimately Sentz informed Overmyer that he did not believe Welsheimer was qualified as a producer. Conversely, Sentz had pushed for Klaus to be hired at BOA two years earlier. Sentz objected to Overmyer about both the hiring of Welsheimer, because he did not believe he was qualified, and about the termination of Klaus, whom Sentz believed to be highly qualified. (Sentz Dec. ¶ 6, 25, 29, 30, 32-34.)

A reasonable jury viewing BOA's evidence on its affirmative defense could arrive at different conclusions as to whether gender was a factor for the wage differential. The Court, therefore, need not address Klaus's argument of pretext here, because a plaintiff bears the burden of producing evidence of pretext solely where a reasonable jury viewing all of the evidence could find only for the defendant. *Timmer*, 104 F.3d at 844 (citing *Brennan*, 523 F.2d at 1031). Even if the Court did proceed to the prextext analysis, the same evidence that precludes a finding as a matter of law that sex played no role in the pay disparity between Welsheimer and Klaus prevents summary judgment on the issue of pretext. *See Cesaro v. Lakeville Community School District*, 953 F.2d 252, 254 (6th Cir.1992) ("Whether plaintiff's case is characterized as a pretext case or a mixed motive case, plaintiff's burden is to prove her gender played a part in the board's decision not to hire her as Director of Special Education."). BOA's Motion for Summary Judgment on Plaintiff's Equal Pay Act claim is accordingly **DENIED**.

## 2.    Gender Discrimination in Violation of Title VII

Klaus alleges that BOA discriminated against her because of her sex in violation of 42 U.S.C. § 2000e-2 and Ohio Rev. Code § 4112.02. Because the elements and legal standards for establishing unlawful sex discrimination are the same under Ohio Rev. Code § 4112.02 and under 42 U.S.C. § 2000e-2, *Little Forest Medical Center of Akron v. Ohio Civil Rights Comm'n*, 61 Ohio St.3d 607, 609-10, 575 N.E.2d 1164 (1991), the Court need not analyze Klaus's sex discrimination claims separately under state and federal law. *Laderach v. U-Haul of Northwestern Ohio*, 207 F.3d 825, 828 (6th Cir. 2000).

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the United States Supreme Court set forth the general evidentiary framework for analyzing workplace discrimination actions. Under the *McDonnell Douglas* burden-shifting analysis, a plaintiff bears the burden of establishing by a preponderance of the evidence a *prima facie* case of discrimination (i.e., a presumption of discrimination).   First, the plaintiff must establish a prima facie case of discrimination. *See McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1159 (6th Cir.1990). To do so, the plaintiff must show that: (1) she is a member of a protected class; (2) she was discharged from her employment; (3) she was qualified for the position; and (4) she was replaced by a person outside of the class. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992). The fourth prong of this test can also be satisfied through a showing that a "comparable non-protected person was treated better." *Id.* at 582-83. Put another way, Klaus must prove that she was a member of a protected class and that "for the same or similar conduct she was treated differently than similarly-situated non-protected employees." *Id.* at 583.   Once the plaintiff establishes a *prima facie* case, an inference of discrimination arises. The burden of proof then shifts to the employer to articulate a legitimate,

-24-

nondiscriminatory reason for the plaintiff's discharge. *Id*. Once established, the burden shifts back to the plaintiff to prove that the employer's articulated nondiscriminatory reason for its action was merely pretext for unlawful discrimination. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). To that end, the plaintiff must prove "that the [employer's] asserted reasons have no basis in fact, that the reasons did not in fact motivate the discharge, or, if they were factors in the [employer's] decision, that they were jointly insufficient to motivate the discharge." *Burns v. City of Columbus*, 91 F.3d 836, 844 (6th Cir. 1996)(citations omitted).

### (a.)    *Direct Evidence*

Klaus contends that the Court need not engage in the *McDonnell Douglas* burden-shifting analysis because she has come forward with sufficient direct evidence of discrimination. In employment discrimination claims, "direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Laderach v. U-Haul*, 207 F.3d at 829. Direct evidence proves the existence of a fact without any inferences or presumptions. *Id*. To establish "direct evidence" of discrimination through a supervisor's comments made in the workplace, the remarks must be "clear, pertinent, and directly related to decision-making personnel or processes." *Dobbs-Weinstein v. Vanderbilt University*, 1 F. Supp.2d 783, 798 (M.D. Tenn.1998), *aff'd*, 185 F.3d 542 (6th Cir.1999) (quoting *Wilson v. Wells Aluminum Corp.*, No. 95-2003, 1997 WL 52921, *5 (6th Cir. Feb.7, 1997) (unpublished)). "[C]omments made by individuals who are not involved in the decision-making process regarding the plaintiff's employment do not constitute direct evidence of discrimination." *Carter v. University of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003)(citing *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 433 (6th Cir. 2002) (holding that a company manager's opinion that "race was a factor" in the

company's decision not to promote the plaintiff was not direct evidence for purposes of the plaintiff's discrimination claim because the manager had "no involvement in the decision-making process with respect to the particular jobs at issue")).

The "direct evidence" Klaus presents is her own testimony and the sworn statements of Sentz who both say that BOA discriminated against Klaus on the basis of her sex. Although the Court has declined to strike Sentz's Declaration, his statements to the effect that the differences in the treatment and pay between Klaus and Welsheimer "is not explained by any[thing] . . . other than gender," (Sentz Decl., *e.g.*, ¶¶ 1, 9), are not direct evidence. Sentz's perception of the events he observed may have led him to believe that gender was a factor but his statements to this effect are not direct evidence. His opinion that gender was a factor, therefore, is not direct evidence for purposes of her discrimination claim because, even if he was a manager (which BOA adamantly contends he was not), he had no involvement in the decision-making process with respect to BOA's decision to terminate Klaus.

Klaus has pointed to no evidence that Overmyer or Ohsner, the two decision-makers on the issue of her termination, made any discriminatory remarks to her about gender or any other remark that "requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 799, 805 (6th Cir. 1999). Klaus has no direct evidence that she was discriminated against because she is a female.

### (b.)    *Indirect Evidence*

#### (I.)    **Prima Facie Case**

Thus, while BOA agrees that Klaus fulfills the first three elements under *McDonnell*

*Douglas,* in that she is a member of a protected class, was qualified for the position and was discharged and suffered an adverse employment action, BOA contends that Klaus cannot establish the fourth element of her a *prima facie* case because she was not replaced by a male when she was terminated.[11] BOA notes that Welsheimer was hired as a producer five months before Klaus's termination, and therefore he did not replace Klaus. The Court rejects this argument.

Plaintiff need not show that she was replaced by a person outside of the protected class. The fourth element of the *prima facie* case of sex-based discrimination may be satisfied through a showing that a "comparable non-protected person was treated better." *Mitchell,* 964 F.2d at 582-83. To that end, as set forth in the statement of facts, Klaus has adduced evidence that Welsheimer, a male, was paid more, received her referrals, was career-coached by their supervisors and generally was favored over her at BOA. BOA's Motion for Summary Judgment is accordingly denied in this respect.

    **(ii.)**    **Legitimate Non-Discriminatory Reason for Discharge**

BOA contends that it discharged Klaus because it made the business decision to exit the personal financial planning business, and the bulk of Klaus's business was in the sale of individual securities and mutual funds. On its face, therefore, BOA has articulated a legitimate, nondiscriminatory reason for Klaus's discharge.

---

[11] BOA makes a lengthy argument to the effect that Klaus's claims that the accounting errors in the calculations of her commissions, the delayed admission into the Master's Club, and the referrals to and other "favored" treatment of Welsheimer are not adverse employment actions. Certainly, not every criticism or trivial employment decision is considered adverse action under Title VII. *Primes v. Reno,* 190 F.3d 765, 767 (6th Cir. 1999). The Court, however, does not construe Klaus's Complaint or argument to mean that she is asserting these instances suffice to satisfy the element of adverse employment action. BOA admits, certainly, that Klaus's termination of employment was an adverse action. The Court assumes Klaus's purpose in presenting evidence of these instances of purported mistreatment is to demonstrate her claim that she was treated differently on account of her gender.

### (iii.)  Pretext

The burden shifts back to Klaus to prove that BOA's reason for its action was merely pretext for unlawful discrimination. *Burdine*, 450 U.S. at 252-53.  Klaus must prove BOA's assertion that it intended to exit the individual financial planning business has no basis in fact, that the reasons did not in fact motivate the discharge, or, if closing this line of business was a factor, it was insufficient to motivate her discharge. *Burns* 91 F.3d at 844.

Genuine issues of material fact preclude summary judgment on the issue of pretext.  In particular, questions of fact must be resolved with respect to BOA's proffered reason for Klaus's termination, namely the closure of the Financial Services Department.  For instance, a jury must weigh the evidence and make credibility determinations regarding why BOA hired Welsheimer in May, 2003 at a salary of $84,000 per year as a producer into a department it had decided to close and then retained him for over two years[12]; why BOA's management team announced in August, 2003, its decision to strengthen its position in the financial services department, as reflected in the Advisory Committee minutes; and why, according to Klaus, BOA never offered the rationale of exiting the market to her at the time of her termination and instead represented in the course of her claim for unemployment benefits that the basis of her termination was lack of production.  Plaintiff also points to questions of fact in the record involving the absence of a formal plan for getting out of the market, and the timing of BOA's announcements regarding this decision, in that they came only after she filed her complaint for discrimination with the EEOC.  Thus, the Court concludes that

---

[12]   The Court emphasizes that BOA contends that it had been in discussions regarding closing the Financial Services Division for years.  Although the date on which BOA made the ultimate decision is disputed, what is clear is that BOA maintains that its discussions regarding closing the department *preceded* its decision to hire Welsheimer.

Plaintiff has demonstrated a question of fact regarding whether BOA's proffered, non-discriminatory reason is a pretext, and that a jury may, but is not required to, infer unlawful discrimination.

BOA's Motion for Summary Judgment as to Plaintiff's Title VII claims is therefore **DENIED**.

### 3.    Retaliatory Discharge

BOA claims that Klaus was not retaliated against for her complaints about discrimination or about purported securities violations. Klaus claims that she, her counsel and/or third parties complained to BOA regarding the company's violations of various laws, including sex discrimination laws, equal pay laws, securities laws, and her concern that Ron Ohsner lacked the proper licenses to oversee registered representatives. Klaus asserts that her termination of employment was in retaliation for these complaints.

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ⋯ because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he [or she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). To establish a *prima facie* case of retaliation, Klaus must prove that: (1) she engaged in protected activity; (2) BOA knew of this exercise of protected activity; (3) BOA subsequently took adverse employment action; and (4) a causal connection exists between the protected activity and the adverse employment action. *Strouss v. Michigan Dep't of Corr.*, 250 F.3d 336, 342 (6th Cir. 2001). BOA maintains that Klaus cannot satisfy her *prima facie* case of retaliation because, with respect to her complaints of gender discrimination, BOA did not know she engaged in protected activity and, with respect to her complaints of securities violations, BOA did

-29-

not take adverse action against her.

### a.     Complaints of Gender Discrimination

The only time Klaus made any mention of sex discrimination to a member of BOA's management was to Human Resources Manager Nancy Price on September 30, 2003, the day after Price notified Klaus she was being terminated. (Klaus Dep., 353, 368-69.)   Klaus avers that she confronted her supervisor, Overmyer, in December 2002 regarding entry into the Master's Club, and told him that "if [she] was being treated equally with [her] male counterparts at BOA, [she] would have been admitted to the Master's Club. . . ." (Klaus Supp. Aff., ¶ 60.)  The Court questions whether this generalized statement is sufficient to impute knowledge to BOA that Klaus believed she believed she was the victim of gender-based discrimination.[13]  Other than this general statement to Overmyer, Klaus has adduced no evidence that she complained of discrimination to any BOA manager with authority to address her concerns prior to September 30, 2003. (Klaus Dep. 369.) Further, after this complaint, Klaus was in fact made a member of the Master's Club.

Because Klaus has not come forward with sufficient evidence to demonstrate that BOA was aware of Klaus's complaints regarding gender discrimination before deciding to terminate her, her retaliatory discharge claim fails as a matter of law. Without knowledge of the protected activity, there can be no inference that the adverse action was taken because of the protected activity. *See Fenton v. HiSAN, Inc.*, 174 F.3d 827, 832 (6th Cir. 1999) (affirming grant of summary judgment where the plaintiff was unable to produce evidence sufficient to establish that the individuals charged

---

[13]     Furthermore, for purposes of her claim of retaliation, Klaus has not shown through evidence or temporal inference a causal connection between this complaint and her subsequent termination several months later. *See Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986).

with taking the adverse employment action knew of the protected activity).

**b.    Complaints of Accounting Irregularities and Violations of Securities Law**

Klaus's claim that she was terminated for complaining about (1) BOA's accounting irregularities; (2) alleged violations of securities laws; and (3) problems with Ohsner lacking proper licenses to supervise her fails because the evidence of record fails to show a causal connection between Klaus's complaints and her subsequent termination. Klaus must provide sufficient evidence from which to infer that her termination would not have occurred but for her complaints. *See Abbott v. Crown Motor Cars*, 348 F.3d 537, 543 (6th Cir. 2003). Temporal proximity alone between the adverse action and the protected activity is insufficient to support an inference of retaliation. *Nguyen v. City of Cleveland*, 229 F.3d 559, 565-567 (6th Cir. 2000). Klaus asserts that she complained in December 2002, approximately 10 months before her termination regarding the purported violations of securities law. (Klaus Dep. 513-15.) This time lapse undermines her assertion of retaliatory motive. Indeed, the casual connection is too tenuous to create an issue of fact regarding BOA's retaliatory motive. Klaus also asserts that she complained "repeatedly" about BOA's corporate accounting practices and compared it to the ENRON scandal. (Klaus Supp. Aff., ¶ 68.) Besides her declaration of that she repeatedly protested, generally, there is simply nothing in the voluminous record of this case to show that Klaus's termination was related to or even motivated by her complaints.

For these reasons, Defendant's Motion for Summary Judgment is on Klaus's claims of retaliation is **GRANTED**.

### 4.      Promissory Estoppel

Klaus asserts a claim for promissory estoppel in relationship to her termination of employment. An employer's right to discharge an employee may be limited by representations or promises made to the employee which fall within the doctrine of promissory estoppel. *Mers v. Dispatch Printing Co.*, 19 Ohio St. 3d 100, 104, 483 N.E.2d 150 (Ohio 1985):

> [T]he doctrine of promissory estoppel is applicable and binding to employment-at-will relationships when a promise which the employer should reasonably expect to induce action or forbearance on the part of the employee does induce such action or forbearance, if injustice can be avoided only by enforcement of the promise. The test in such cases is whether the employer should have reasonably expected its representation to be relied upon by its employee and, if so, whether the expected action or forbearance actually resulted and was detrimental to the employee.

*Kelly v. Georgia-Pacific Corp.*, 46 Ohio St.3d 134, 139 545 N.E.2d 1244, 1250 (Ohio 1989).

To establish a promissory estoppel claim, Klaus must produce evidence of a specific promise of continued employment. She cannot rely on "nebulous representations" by the employer, but must point to "specific promises." *Bruno v. Struktol Co.*, 62 Ohio App.3d 509, 514 (Summit Ct. App. 1991). Moreover, these promises must be clear and unambiguous in their terms and an employee's reliance upon them must be reasonable and foreseeable. *Healey v. Republic Powdered Metals, Inc.*, 85 Ohio App.3d 281, 284 (Medina Ct. App. 1992).

Klaus admits that no one promised her a specific duration of employment. (Klaus Dep. 178.) She concedes that her employment at BOA was not guaranteed. (Klaus Dep. 178-79, 180.) Klaus has pointed to no other promise, representation or even implication that BOA promised her continued employment. Further, had she identified some representation in the record that could have implied a guarantee of continued employment, Klaus's reliance on any alleged promises would have

-32-

been unreasonable in light of her Employment Agreement which provides that her employment "may be terminated at any time, by either party, with or without cause" and contains an integration clause indicating that it was "the entire understanding" of the parties regarding employment, and could not be amended or modified unless by written instrument executed by both parties. (Empl. Agmt., § 18); *Lane v. Terminal Freight Handling Co.*, 775 F. Supp. 1101, 1105 (N.D. Ohio 1991)(plaintiff's claims of promissory estoppel failed as matter of law due to at-will provision in application). Accordingly, BOA's Motion for Summary Judgment on Klaus's claim of promissory estoppel is **GRANTED.**

### 5.  Breach of Contract

Klaus claims that BOA breached its Agreement with her by failing to pay her earned commissions, for not crediting her for business in underwriting at the time of her termination and by failing to give her 30 days advance notice before her termination.

In order to show a breach of contract, Klaus must prove four elements: (1) the existence of and terms of a contract; (2) performance by Klaus under the contract; (3) BOA's breach of the contract; and (4) damages or loss caused by the breach. *Samadder v. DMF of Ohio, Inc.*, 154 Ohio App. 3d 770, 778 (Franklin Ct. App. 2003). BOA claims that it did not breach the Employment Agreement, and Klaus's breach of contract claim, therefore, fails.

BOA's Motion for Summary Judgment on Klaus's breach of contract claim is **DENIED**. The parties dispute whether BOA has paid Klaus all the money she earned in commissions while employed. Klaus contends that BOA received revenues on business that she generated for several clients after she left and that BOA miscalculated commissions owed to her even while she was employed there.

-33-

BOA concedes that it failed to pay Klaus the commissions in underwriting at the time she was fired, but asserts that BOA's consistent "policy and practice has been to pay producers on a cash basis, so producers will not receive a commission if they are not longer employed at BOA." (Def's MSJ, at p. 27; Knaul Dep. 120-21.) Since Klaus was not employed at the time BOA actually received the commissions, BOA contends she was not entitled to any commissions from her business that were pending.

The language of Klaus's Employment Agreement, however, indicates that Klaus was to be "paid on the basis of a percentage of all gross commissions[14] generated by the Producer and received by BOA. . . ." (Empl. Agmt., § 3(b).) Notwithstanding BOA's contention regarding its policy to withhold earned commissions from terminated employees, the contract contains no such exception and instead speaks broadly in terms of "all" commissions. Summary judgment is, therefore, inappropriate.

Similarly, the facts are in dispute as to whether BOA breached the Employment Agreement by failing to give Klaus 30-days written notice as to her termination. BOA asserts that it "opted" to pay Klaus for that 30-day period, and that, therefore it substantially performed the terms of the contract because it paid her through this period in lieu of notice.

"The long and uniformly settled rule as to contracts requires only a substantial performance in order to recover upon such contract. Merely nominal, trifling, or technical departures are not sufficient to breach the contract." *Ohio Farmers Ins. Co. v. Cochran*, 104 Ohio St. 427, 135 N.E. 537, Syll., ¶ 2 (Ohio 1922). "A court should confine the application of the doctrine of substantial

---

[14] "Gross commissions" is defined as "all fees product commissions, and other revenues generated by Producer's selling of a product or performance of a service, and received by BOA and recorded as revenue under generally accepted accounting principles." (Empl. Agmt., Schedule A.)

performance to cases where the party has made an honest or good faith effort to perform the terms of the contract." *Burlington Resources Oil & Gas Co. v. Cox* ,133 Ohio App.3d 543, 548, 729 N.E.2d 398 (Jackson Ct. App. 1999)(citing *Ashley v. Henahan*, 56 Ohio St. 559, 47 N.E. 573, Syll. ¶ 1(Ohio 1922)). The determination whether a material breach of an agreement has occurred is generally a question of fact. *Kersh v. Montgomery Developmental Center,* 35 Ohio App.3d 61, 519 N.E.2d 665 (Franklin Ct. App. 1987).

Klaus contends that she was injured in her ability to look for employment since she had no time to seek other positions while still employed. Instead, as she applied, following her termination, she was required to disclose that she had been terminated by BOA. The contract expressly requires 30 days notice, which was not given. A jury must decide if such breach was material.

Genuine issues of material fact preclude summary judgment with respect to whether BOA failed without legal excuse to perform the promise to provide 30 days written notice to Klaus. BOA's Motion for Summary Judgment on Klaus's breach of the Employment Agreement is therefore denied with respect to this aspect of her claim.

**B.     Cross Motions for Summary Judgment as to BOA's Counter-Claims Against Klaus**

BOA has counter-claimed against Klaus for breach of contract, conversion and unjust enrichment with respect to its assertion that she retained her overdrawn commissions in the amount of $9,683.34. BOA also asserts claims for breach of the non-competition and non-solicitation provisions of her Employment Agreement, as well as a claim for disclosing confidential trade information. Both Klaus and BOA seek summary judgment with respect to the Counter-Claims.

**1.     Additional Facts Relating to Counter-Claims**

During her employment, BOA provided Klaus with client, referral, and policyholder lists,

expiration lists, financial data, marketing and business plans and methods, business strategy, and other confidential and trade secret information so she that could service existing BOA's clients and solicit new ones. BOA maintained an Access database for the Financial Services Division containing a listing of financial services clients and what products they had purchased through BOA. Klaus admits she had access to and used BOA's client lists. Through her work and various reports from BOA, Klaus became privy to her clients' intimate financial details.

Beginning on September 30, 2003, BOA contends that Klaus called seven of her former clients to ask them to transfer their business from BOA to her. Off the seven clients, five said they would transfer their business to her; another client eventually did so as well. Klaus is now servicing these six clients.

BOA asserts that Klaus also contacted Kinetics Noise Control, a client for whom she had been setting up a corporate 401(k) plan for its employees when she was at BOA. Soon after Klaus contacted Kinetics, Kinetics transferred its business to her. BOA asserts that the Kinetics Noise Control account was worth $56,821.14.

In December 2003, Klaus formed Klaus Financial Services LLC. Through her business, Klaus sells IRA's, retirement plans, insurance, investments, and financial planning. Klaus has sold these products and services to some of the clients she serviced at BOA.

BOA also asserts that Klaus improperly solicited up to 30 of its clients and removed BOA's name from the existing investment account it had with or through BOA and substituted Klaus's name as the broker-dealer. Also, in April 2005, Klaus contacted Michael Schoedinger, the Executive Vice President of Schoedinger Funeral Homes and long-time BOA client, in an effort to solicit his company's 401(k) business.

-36-

### 2. Standard for Cross-Motions for Summary Judgment

The parties have filed cross-motions for summary judgment. Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that she or the company is entitled to a judgment as a matter of law. The fact that one party fails to satisfy that burden does not automatically indicate that the opposing party has satisfied the burden and should be granted summary judgment on the other motion. In reviewing cross-motions for summary judgment, courts should "evaluate each motion on its own merits and view all facts and inferences in the light more favorable to the non-moving party. *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994). "The filing of cross-motions for summary judgment does not necessarily mean that the parties consent to resolution of the case on the existing record or that the district court is free to treat the case as if it was submitted for final resolution on a stipulated record." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)(citing *John v. State of La. (Bd. of Tr. for State Coll. & Univ.)*, 757 F.2d 698, 705 (5th Cir.1985)).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation. *Taft Broad.*, 929 F.2d at 248. The Court reviews each party's motion separately, determining, for each side, whether a judgment may be entered in accordance with the standards of Rule 56. Both motions must be denied if the Court finds that there is a genuine issue of material fact. If, however, there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the Court will render judgment.

### 3. Analysis

By its Counter-Claim, BOA seeks to enforce the non-competition provision contained in Klaus's Employment Agreement. BOA maintains that the non-competition agreement was designed

to protect its legitimate interests and confidential client information and that the two year restriction against soliciting BOA clients is no greater than necessary. It seeks summary judgment on its claims that Klaus breached her contract to repay her overdrawn commissions, and that she breached her non-competition agreement.

Klaus, on the other hand, seeks summary judgment on BOA's Counter-Claim regarding breach of the covenant not to compete for three reasons: (1) the business withdrawal doctrine precludes BOA from asserting a breach of the covenant not to compete as to a market segment from which it has withdrawn; (2) the prior breach doctrine prevents BOA from enforcing the covenant by reason of its own failure to perform the terms of the Employment Agreement; and (3) the covenant is unreasonableness on its face because it has no geographic limitations.

General principles of reasonableness guide the Court's consideration of whether the non-competition clause in Klaus's Employment Agreement is enforceable. A covenant not to compete "which imposes unreasonable restrictions upon an employee will be enforced to the extent necessary to protect the employer's legitimate interests. A covenant restraining an employee from competing with his [or her] former employer upon termination of employment is reasonable if it is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public." *Raimonde v. Van Vlerah*, 42 Ohio St.2d 21, 25-26, 325 N.E.2d 544 (Ohio 1975).

### (a.) Business Withdrawal Doctrine

An employer who withdraws from a market segment may not enforce a non-compete covenant against former employees who seek to compete in that segment. In *Premier Assoc., Ltd. v. Loper*, 149 Ohio App.3d 660, 778 N.E.2d 630 (Champaign Ct. App. 2002), the court considered

an employer's claim to enforce a covenant not to compete with respect to a field of business from which it had temporarily withdrawn after terminating the employment of all the employees in the department providing those services. The employer, Premier, notified the employee of his termination and indicated that it would be winding up its business operations effective immediately. Premier also notified its customers that it intended to terminate its services. Ultimately, Premier did not go out of business but was sold to another company which sought to enforce the employee's non-compete agreement. The court reasoned that enforcement of a non-compete provision under such circumstances would fracture the public policy that allows enforcement of such clauses for limited times, places and purposes. *Id.*

BOA contends that it had not withdrawn from the market when Klaus began violating her non-competition agreement, and that it retains a legitimate interest in protecting against competition in the market she services.[15] The Court concludes that summary judgment is inappropriate because triable issues of fact remain as to when BOA decided to withdraw from the market, when it fully divested itself of its individual securities accounts and whether that withdrawal from the market vitiated Klaus's obligation to comply with the covenant not to compete. In particular, genuine issues of material fact remain for resolution as to whether BOA has a legitimate interest to protect in the field of individual securities accounts. The question is whether it would be unreasonable to enforce a non-competition agreement that precludes Klaus from selling products or services "provided by BOA at the time of [Klaus's] termination," (Empl. Agmt., ¶ 13b(I)), and, in this context, to impose an injunction *now* prohibiting Klaus from competing, in a market that BOA no longer occupies. *See*

---

[15]     The Court notes that BOA's position on this issue is, at least to some extent, in conflict with its position as to Plaintiff's Title VII claim, that she was let go because BOA was abandoning her lines of product.

*Premier Health Care Servs., Inc. v. Schneiderman*, Case No. 18795, 2001 WL 1658167 (Montgomery Ct. App. Dec. 28, 2001)(unreported)("Although at the time of the signing of the employment agreement between the parties a legitimate business interest may have existed for the injunction in Appellants preserving their exclusive contract . . . with MVH, at the time Appellants sought a preliminary injunction , . . . this legitimate business interest no longer existed because MVH had terminated the contract with Appellants.") The Court concludes that issues of fact remain for resolution regarding the reasonableness and interest of the public and BOA in enforcing the covenant.[16]

### (b.)    Prior Breach

The Court concludes that genuine issues of material fact preclude entry of summary judgment on the Counter-Claims for either party. Resolution of whether Klaus's non-solicitation agreement is enforceable requires a final determination on Klaus's alleged initial breach of contract claim against BOA. For instance, Klaus contends that she was excused from performance under the contract because BOA breached the Employment Agreement first. The Court has already determined that a jury must resolve the question of whether BOA materially breached the Employment Agreement, and therefore cannot determine, as a matter of law, whether Klaus was excused under its terms.

BOA, nonetheless, contends that the 30-day notice requirement, which it allegedly breached, is separate and severable from the non-solicitation agreement, and thus the issue regarding prior

---

[16]      Klaus also contends that her obligation to comply with security regulations, specifically, NASD Rule 11870, renders the covenant unreasonable. Because the Court has determined that issues of fact remain regarding the reasonableness of the covenant not to compete, precluding summary judgment, the Court does not address this argument.

-40-

breach is irrelevant for purposes of enforcing the covenant. The Court disagrees.

BOA relies upon *Barnes Group, Inc. v. O'Brien*, 591 F. Supp. 454 (N.D. Ind. 1984)(applying Ohio law). In *Barnes*, the clause at issue clearly and unambiguously stated: "This covenant [not to compete] on the part of the Salesman is of the essence of this agreement; it shall be construed as independent of any other provision in this agreement, and the existence of any claim or cause of action of the Salesman against the Company, whether predicated on this agreement or otherwise, shall not constitute a defense to the enforcement by the Company of this covenant." Id. at 462. In contrast to the language in *Barnes*, the Employment Agreement at issue here contains no such language, and instead simply states that "The unenforceability of any term or provision of this Agreement shall not impair or affect the other provisions hereof, which shall remain in full force and effect." (Empl. Agmt.,¶19.) Here, while the clause could potentially save the entire contract from being rendered unenforceable in the face of a public policy challenge to portions of it, the Court cannot conclude as a matter of law that the parties manifested a clear intention that the covenant not to compete would be enforceable even if BOA first committed a material breach of the contract.

### (c.)     Geographic Restrictions

Klaus argues that the covenant not to compete is unenforceable because it is unbounded by geography. *See Cad Cam, Inc. v. Underwood*, 36 Ohio App.3d 90, 521 N.E.2d 498 (Montgomery Ct. App. 1987)(holding non-competition covenant unlimited both in geographical area and in time was unenforceable). BOA points out that the contract does not contain a geographic limitation because the non-solicitation restriction is client-specific and more narrow than one based on geography.

-41-

Under Ohio law, customer restrictions may substitute for a geographic restriction. *Premix, Inc. v. Zappitelli*, 561 F. Supp. 269 (N.D. Ohio 1983). The clause prohibits Klaus only from soliciting business of BOA's clients. Under these circumstances, the Court rejects Klaus's argument and finds that the lack of a geographic restriction does not render the covenant not to compete unenforceable.

## V.

For the foregoing reasons, BOA's Motion to Strike the Declaration of Shawn Sentz is **DENIED**, and its Motion to Strike the Supplemental Affidavit of Angela Klaus is **DENIED**. BOA's Motion for Summary Judgment on Plaintiff's claims is **GRANTED IN PART AND DENIED IN PART**. Klaus's Motion for Summary Judgment on BOA's counter-claim is **DENIED**; BOA's Cross-Motion for Summary Judgment on the counter-claim is **DENIED**. BOA's Motions for oral argument are **DENIED**.


**IT IS SO ORDERED.**


_6-30-2006_
**DATED**                                      **EDMUND A. SARGUS, JR.**
                                               **UNITED STATES DISTRICT JUDGE**